## Staunton.

## VIRGINIA PILOT ASSOCIATION AND OTHERS V. COMMONWEALTH OF VIRGINIA, ETC.

### September 23, 1926.

1. PILOTS—*Rates—State Corporation Commission—Second Change within Two Years—Acts of 1924, Page 63 (Code of 1924, Section 3774 (a) ).*— Acts of 1924, page 63, Code of 1924, sec. 3774 (a), directed the State Corporation Commission to "prescribe and enforce the rates of pilotage and other charges to be observed in the business of pilotage." On August 10, 1925, the Commission formulated an order specifying certain rates for pilotage. These rates were greater then the previously existing rates. On August 20, 1925, the Commission, after a prolonged hearing, entered an order specifying rates for pilotage lower than those formulated in the order of August 10, 1925. It was contended that the Commission was without jurisdiction to substitute and enter the second order on August 20, 1925, because of the provision in the Act of 1924 (Acts of 1924, page 63) providing that the rates should not be altered more than once in two years. The reason assigned for the change was that the rate specified in the first order failed to effectuate the true purpose of the Commission which was to reduce the pre-existing rates materially. The Commission was informed by its experts that the first order would bring about a reduction in the existing rates. After the entry of the order it was discovered that a classification had been incorporated without the attention of the Commission being directed to it and that the rates affected was actually increased instead of the decrease contemplated. These facts were taken by the Commission to constitute error of a clerical character.

   *Held:* That the Commission had jurisdiction to enter the second order.

2. CORPORATION COMMISSION—*Final Order—Pilotage Rates—Second Change within Two Years—Case at Bar.*—In the instant case the Corporation Commission on August 10, 1925, formulated an order specifying certain rates for pilotage. On August 20, 1925, the Commission substituted another order fixing the rates for pilotage at a lower rate than those in the order of August 10, 1925. It was assigned as error that the order of August 10, 1925, was final and should be treated as an irrevocable judgment of a court of record; and that, therefore, the order of August 20, 1925, was void because Acts of 1924, page 63,

provides that the rates of pilotage should not be altered more than once in two years.

*Held:* That there was no force in this contention because the second order was entered in the same term as the first order.

3. CORPORATION COMMISSION—*Legislative or Administrative Powers—Fixing Rates of Pilotage.*—In fixing rates of pilotage under Acts of 1924, page 63, the Corporation Commission is exercising legislative or administrative powers and is not bound by all the limitations of courts of record in exercising their judicial functions. The fixing of rates has invariably been held to be a legislative function.

4. CORPORATION COMMISSION—*Fixing Pilotage Rates—Acts of 1924, page 63—Construction of the Limitation that Rates shall not be Altered more than Once in Two Years—Case at Bar.*—The limitation upon the power of the Corporation Commission to fix rates of pilotage, that the power shall not be exercised more than once in two years, is found in the proviso of the Acts of 1924, page 63. When this rate-making power has been exercised and the rates finally promulgated, the power cannot be again exercised for two years. This restriction, limiting the power of the Commission, should not be so narrowly construed as to prevent the correction by the Commission of its own mistakes, either of form or substance; and where an order is entered fixing the rates until the date when the new rates are to become effective, until some new rights have become established and new duties imposed, so that a substantial change might work an injustice or legal wrong, these rates and all questions relating thereto are still under the control of the Commission.

5. CORPORATION COMMISSION—*Pilotage Rates—Review of Rates by the Supreme Court of Appeals—Assignment of Cross Error—Case at Bar.*—In the instant case, on August 10, 1925, the Corporation Commission issued an order fixing the rate of pilotage under the authority conferred by Acts of 1924, page 63. On August 20, 1925, the Commission issued a second order decreasing the rates fixed by the first order, the validity of which is questioned by the appellees. The appellees assigned cross error on the merits, as to the first order, if it should be held effective.

*Held:* That in either event the action of the Commission would be reviewed by the Supreme Court of Appeals and the rates to be prescribed considered and determined, so as to effectuate the legislative purposes.

6. CORPORATION COMMISSION—*Fixing Rates of Pilotage—Act of 1924, Page 63—Commission Deciding as to Boats or Other Equipment Necessary or Proper for the Pilots—Case at Bar.*—In the instant case appellants assigned as error that the Corporation Commission, in an order under the authority conferred by Acts of 1924, page 63, fixing the rates of pilotage assumed the power and duty of deciding what boats or other equipment were necessary or proper for the pilots to

have for the performance of their duties. The order merely undertook to prescribe the rates to be charged in the future, although in order to determine a fair basis for such rates evidence was taken showing equipment and past operations, and the Commission referred to some of the equipment as superfluous and too expensive. The appellants themselves undertook to show the equipment necessary.

*Held:* That the order was not an invasion of the rights of the pilot association to conduct its business in its own way, subject only to the prescribed rates and the supervision of the Board of Pilot Commissioners.

7. PILOTS—*Rates—Rates Fixed by the Corporation Commission by its Order of August 20, 1925—Case at Bar.*—In the instant case appellants, the Virginia Pilot Association, claimed that the order of the Corporation Commission of August 20, 1925, fixing the rates of pilotage under the authority conferred by Acts of 1924, page 63, were ruinously low and that the undisputed fact showed clearly that the pilotage rates in Virginia should be materially increased.

*Held:* That the evidence in the record did not support these claims of the pilotage association.

8. PILOTS—*Rates of Pilotage—Compulsory Pilotage.*—Where pilotage is compulsory as in Virginia, rates lower than those charged at ports where pilotage is not compulsory, may be justified.

9. PILOTS—*Pilotage Rates—Comparison with Rates of Other Ports—Bunker Rates.*—In comparing the rates of pilotage in Virginia with rates charged in other Atlantic ports, in order to determine the reasonableness of the Virginia rates, it is unfair to combine in the same table bunker rates and cargo rates in Virginia.

10. PILOTS—*Pilotage Rates—Comparison with Rates of Other Ports.*—In determining the reasonableness of pilotage rates in Virginia, comparisons with the rates charged at other Atlantic ports while useful—worthy of careful consideration—are nevertheless confusing and contradictory. They are unconvincing and of little probative value unless many other factors are likewise considered, such as the differences in volume, tonnage of ships, climate, distance, tides, time employed, and other local conditions. In Virginia conditions are extremely favorable to the business of pilots and the pilotage rates should not be higher than those in other ports lacking the advantages of the Hampton Roads ports.

11. PILOTS—*Pilotage Rates—Order of the Corporation Commission of August 20, 1925, Reducing Rates—Equipment.*—The expenses of operations and the equipment of the Virginia Pilot Association compared with such expenses and equipment at other ports appear to sustain the charge of extravagance against the association. They indicate that there could and should be a reduction in rates such as those fixed in the order of the Corporation Commission of August 20,

1925, which under less extravagant administration promise to yield ample returns to each pilot upon his property investment, and fairly pay him for his services.   The two years' experiment cannot be disastrous to the pilots and after that time the rates can be reconsidered in the light of experience.   Therefore the order of August 20, 1925, was sustained in the instant case.

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*W. D. Cardwell* and *R. M. Lett*, for the appellant.

*Tazewell Taylor, Nathaniel T. Green, C. M. Chichester,* and *John R. Saunders, Attorney General,* and *Leon M. Bazile* and *Lewis H. Machen, Assistant Attorneys General,* for the appellees.

PRENTIS, P., delivered the opinion of the court.

The Virginia Pilot Association is not a partnership, but is a voluntary unincorporated association of pilots, each of whom is licensed and authorized by law to conduct the business of pilotage in Virginia.   These pilots are engaged in the performance of an important, necessary and valuable public service, which it is conceded that they discharge faithfully and efficiently. They have no competition, and are regulated by statute.   Code, chap. 142, secs. 3613 to 3647, inclusive. The Board of Pilot Commissioners have general supervision over and control of them.   This board is charged with the duties of examining pilots for license, originally and annually; of determining their number; of enforcing the laws, requiring them to discharge their duties properly; has power to revoke their licenses for misconduct or neglect of duty, and may otherwise enforce discipline.

In 1908 their rates of charge for services were last fixed by statute (Code, sec. 3626). Responding to a persistent public demand, the General Assembly, in 1924, passed an act directing the State Corporation Commission to "prescribe and enforce the rates of pilotage and other charges to be observed in the business of pilotage." Acts 1924, p. 63.* This proceeding resulted.

The Commission, after a prolonged hearing, during which much testimony was introduced, entered an order on August 20, 1925, which provides: "That on

---

*"Chap. 70.—An act to confer upon the State Corporation Commission jurisdiction and to impose upon it the duty to prescribe and enforce rates of pilotage and other charges to be observed in the business of pilotage and to prescribe the procedure.

Approved February 28, 1924.

"1. Be it enacted by the General Assembly of Virginia, That on and after the fifteenth day of July, nineteen hundred and twenty-four, the State Corporation Commission shall prescribe and enforce the rates of pilotage and other charges to be observed in the business of pilotage, but before the said Commission shall fix or prescribe any such rates or charges it shall first give ten days' notice of the time and place of meeting to the individual pilot, company or association, and all owners, charterers, operators or agents of vessels who are directly affected by such rates or charges, by publication in a newspaper of general circulation, in each of the cities of Norfolk, Portsmouth and Newport News. For the purpose of determining the fair basis of such rates and charges the Commission shall have access to the books and records of the individual pilots and any association of pilots for the two years next preceding, whose rates are to be fixed by them, and shall have the same powers in all respects as is given by law in matters affecting transportation and transmission companies.

"2. When such rates and charges shall have been fixed and prescribed by the said commission, they shall be the legal rates and charges for pilotage in Virginia, and shall be enforced as provided by law, and the State Corporation Commission shall have the power to change or alter such rates or charges, after the notice and hearing as hereinbefore provided in this act, except that such rates or charges shall not be altered more than once in two years.

"3. From any action of the State Corporation Commission under this section, an appeal may be taken by the individual pilots, company or association affected, or by any other person, firm, company or corporation feeling himself aggrieved by such action, in the maner prescribed in section one hundred and fifty-six of the Constitution of nineteen hundred and two for appeals from actions of the Commission prescribing rates, charges or classifications of traffic affecting transportation and transmission companies.

"4. All acts or parts of acts fixing rates in conflict with such rates and charges so fixed are hereby repealed, insofar as they are in conflict therewith.

and after October 1, 1925, for all vessels required by law to employ, or voluntarily employing State licensed pilots going from sea to Smith's Point, West Point, Newport News or Norfolk, or any intermediate point; and from Smith's Point, West Point, Newport News or Norfolk, or any intermediate point to sea (for any purpose except fuel coal or fuel oil), the rates of pilotage shall be as shown in the following table:

### Cargo Rates.

| Net Tonnage | Rate Per Foot of Draft |
|---|---|
| Under 501 tons | $2 40 |
| 501-1,000 inclusive | 2 30 |
| 1,001-1,500 inclusive | 3 20 |
| 1,501-2,000 inclusive | 3 60 |
| Over 2,000 | 4 00 |

For all such vessels sailing at any of said ports for the sole purpose of taking bunker coal or fuel oil for their own consumption without landing elsewhere, the rates of pilotage shall be as shown in the following table:

### Bunker Rates.

| Net Tonnage | Rate Per Foot of Draft |
|---|---|
| Under 501 tons | $1 68 |
| 501-1,000 inclusive | 1 96 |
| 1,001-1,500 inclusive | 2 24 |
| 1,501-2,000 inclusive | 2 62 |
| Over 2,000 | 2 80 |

It is further ordered: That the present rates of pilotage to any other port in the State, and incidental, auxiliary and port charges, as heretofore existing, be continued in effect and that the Virginia Pilot Association and any other licensed pilots file with the Commission a schedule of all rates to be charged by them pursuant to this order, on or before October 1, 1925.

It is from this order that the association and W. R. Boutwell (president), for himself and all other licensed pilots in Virginia, have taken this appeal.

[1] 1. These circumstances are relied on to support the first assignment of error: On August 10, 1925, the Commission handed down its opinion and formulated an order specifying certain rates for pilotage. These rates not only exceeded those fixed in the substituted subsequent order of August 20, 1925, but were also greater than the previously existing rates. It is insisted, because of the proviso in section 2 of the act of 1924, that the rates established thereunder by the Commission "shall not be altered more than once in two years," that therefore the Commission was without jurisdiction to substitute and enter the second order on August 20, 1925.

The reason assigned for the change was that the rates specfied in the first order failed to effectuate the true purpose of the Commission. This purpose was to reduce the pre-existing rates materially, and is thus expressed by the Commission in its certificate:

"The so-called order of August 10, 1925, was initiated and mailed out but was never spread on the order book and no order book containing it had been signed as is done in case of all orders of the Commission.

"In the meantime substantial changes had been requested by counsel for the pilot association.

"The so-called order of August 10th and the opinion

upon which it was based were prepared under the authority of the State Corporation Commission but not personally by any member of the Commission and the involved calculations were made by the rate experts employed by the Commission under like authority as is customary and necessary in such cases. The Commission was informed and acted upon the assumption that the order would effect, and that the opinion supported, a net reduction in the income of the Virginia Pilot Association of from $60,000 to $80,000 per annum, and involved the adoption of what is known as the 'Boston plan,' with a cut of rates that would bring about the reduction mentioned.

"After the entry of the order, it was discovered that a classification further than that in the Boston plan had been incorporated into the opinion and into the so-called order without the attention of the Commission being directed to that fact, and that the rates prescribed in the so-called order effected an actual increase of about $17,000 rather than a decrease of approximately $80,000, as contemplated.

"These facts were taken by the Commission to constitute error of clerical character.

\*　　　　\*　　　　\*　　　　\*

"No change in the order of August 10th was made except those necessary to give effect to the intention, judgment and decision of the Commission with a view to effecting the reduction of income and a decrease of rates, with the exception of the change of language prescribing a fixed rate instead of a maximum rate which had been requested by counsel for the Virginia Pilot Association."

There are several other sufficient answers to this assignment and criticism.

[2] The basis of the assignment is that the order of

August 10th was final, and should be treated as the irrevocable judgment of a court of record. Even if the strictest rule applicable to the courts should be enforced, it would not support this contention, because the second order was entered at the same term—that is, during the Commission's June term, which did not end until August 31, 1925, *i. e.*, on the day before its September term began.

[3] Again, the rule does not apply because the Commission was not exercising judicial functions in this proceeding. It was exercising a delegated legislative function. It is unnecessary to cite authority to show that the fixing of rates has invariably been held to be a legislative function. It follows that in exercising legislative or administrative powers the Commission is not bound by all of the limitations of courts of record in exercising their judicial functions.

This distinction, so far as applicable to the Virginia Commission, is indicated in *Reynolds* v. *Alexandria Motor Bus Line*, 141 Va. 213, 228, 126 S. E. 201, 205. This is there said (p. 228): "The extent of the powers of the Commission to change an order made at one of its previous public sessions, or to enter *nunc pro tunc* orders, need not be considered as the orders of June 27, 1923, and July 7, 1923, were made at the same term. In the instant case, the Commission was entirely within its rights and powers in entering the order of July 7, 1923."

[4] The limitation upon the Commission (except the constitutional inhibitions) is found in the proviso of the 1924 statute. When this rate-making power had been exercised and the rates finally promulgated, the power could not be again exercised for two years. This restriction, limiting the power, should not be so narrowly construed as to prevent the correction by the

766 Virginia Pilot Asso. *v.* Com., 145 Va. 757.

Commission of its own mistakes, either of form or substance. It seems to us manifest that until the date when the new rates were to become effective (October 1, 1925), until some new rights had become established and new duties imposed so that a substantial change might work an injustice or legal wrong, these rates and all questions relating thereto were still under the control of the Commission. As the first order had not become effective, its powers had not been completely exercised or exhausted. It had plenary jurisdiction to promulgate the second order of August 20, 1925.

[5] The result would be the same here if this were not true, because the appellees are assigning cross-error on the merits, as to the first order, if it should be held effective, so that in either event the action of the Commission would be here reviewed, and the rates to be prescribed considered and determined, so as to effectuate the legislative purpose.

[6] 2. Another error assigned is thus stated: "That the Commission erred in assuming the powers and duties of deciding what boats or other equipment and facilities are necessary or proper for the pilots to have for the performance of their duties and the efficient service of commerce."

A reference to the order appealed from, which has already been fully quoted, shows that the Commission committed no such error. The mandate only embraces the rates and merely undertakes to prescribe the rates to be charged in the future. True it is that in order to determine "the fair basis of such rates," using the words of the statute, it was necessary to examine the books and records "for the two years next preceding," to ascertain the past revenue, expense of conducting the business, and its profits, and also to take evidence

showing equipment and operations, so as to forecast the future therefrom as far as possible. These experiences of the past, operations of the present and forecasts for the future were, however, informing and enlightening. They afford the best, if not the only, means for intelligently determining the vital issue, *i. e.*, the rates for the future. Moreover, the appellants, themselves, undertook to show the equipment necessary, and relied upon identical circumstances as justification for the increased rates which they asked for, but which the Commission denied.

While in its opinion, and as justifying the view that the rates should be reduced, the Commission referred to some of the equipment as superfluous and too expensive, and indicated its views as to such unnecessary extravagances of the past, and suggested practical economies desirable for the future, all of this must be construed as argumentative and advisory. No order, force or direct compulsion was attempted, and the Commission merely undertook first to hear all the evidence offered and then to obey the mandate of the General Assembly, that is, to fix the rates. There has been neither abuse of power nor invasion of the right of the association to conduct its business in its own way, subject only to the prescribed rates and the supervision of the Board of Pilot Commissioners.

[7] 3. We reach then the other assignment, which presents the crucial question. It is claimed with repetition, resolution and earnestness, not only that the reduced rates fixed by the Commission are ruinously low, but it is said that "the uncontradicted evidence and undisputed facts show clearly that the pilotage rates in Virginia should be materially increased."

[8] To determine the precise rates is difficult—extremely so; but the record does not support either

these vigorous claims or justify the assaults which are made upon the opinion of the Commission and its judgment. In our view of the case, it will be unnecessary for us to follow or discuss the evidence in detail. There are sharp differences of opinion. Many comparisons with pilotage rates at other American ports are made, but it also appears that the physical conditions of the harbors, equipment used, the number and size of ships piloted and methods widely differ. One marked difference in favor of these reduced rates is that there is compulsory pilotage in Virginia. Ships other than coastwise vessels in charge of a licensed United States pilot and under the American flag are compelled to accept and pay for pilotage in Virginia, whether the service is needed or not; whereas at some other ports, notably those in Maryland and Pennsylvania, there is no such compulsory pilotage service on American ships carrying export coal.

[9] Then, for many years there have been bunker rates for pilotage of vessels entering Virginia ports. These are lower than cargo rates, and apply to vessels entering for the sole purpose of taking on coal or fuel oil for their own consumption. This differential seems to have been originally agreed to, and is maintained for the purpose of promoting the coal business at the Hampton Roads coal piers. They are believed to be beneficial to the pilots and to supply them with much additional business and revenue which would not otherwise accrue. By combining in the same table these bunker rates (which should be separately tabulated and considered) with the cargo rates, the appellants show that the Virginia rates, as a whole, are materially lower than the cargo rates at the other Atlantic and Gulf ports.

This is an analysis of Exhibit "A," made by and

much relied on by the appellants as justifying their contentions:

*"Average Pilotage Per Ship Under Rates of August 20th Compared with Rates of Other Ports.*

(On basis of 1,000 ships, Exhibit 'A.')

|  | Pilotage Per Ship | Difference (Less) | Percentage of Difference. |
|---|---|---|---|
| Virginia ($139.-<br>12) old rate | $120 92 | $18 20 | $13 08 |
| Boston | 175 61 | 54 60 | 31 14 |
| New York | 136 52 | 16 60 | 11 43 |
| Philadelphia | 179 00 | 58 08 | 32 45 |
| Baltimore | 195 26 | 74 34 | 38 07 |
| Charleston | 149 01 | 28 09 | 18 85 |
| Savannah | 167 69 | 46 77 | 27 89 |
| New Orleans | 217 55 | 96 63 | 44 42 |
| Galveston | 143 69 | 22 77 | 15 50 |

"This table shows that the average pilotage per ship at the four principal ports north of Virginia is $171.59. The average of the four principal ports south of us is $169.98. The average of all of the above named ports, exclusive of Virginia, is $170.79."

These figures lose much of their significance when this analysis and criticism, made by the appellees' counsel of this Exhibit "A" is considered:

"This exhibit lists names of 1,000 steamers paying pilotage totaling $139,388.57. Of these steamers 123 paying only one way pilotage, amounting to $8,187.73 are included, leaving a net number of round trip steamers, 877, paying $131,200.84—average per steamer $149.60, as against $139.38, as shown in other ex-

hibits. After making this first correction, there is a further correction. Of the 877 remaining steamers, there were 413 steamers calling at Hampton Roads for orders and bunkers, and for bunkers only, on which pilotage was charged based on full rate inward, and bunker rate outward, or bunker rates for the round trip.

"This method of arriving at the average rate per steamer at Hampton Roads is incorrect, for the reason it applies a combination cargo and bunker rate, and a bunker rate, compared with those ports only having a regular cargo pilotage rate, viz., Boston, New York, Philadelphia, Baltimore, and others. The only true method of arriving at a proper average is by using, on those steamers, a rate that would apply at the ports involved, viz., a cargo rate.

"In the list of 1,000 steamers shown in Exhibit 'A' there are 464 such steamers, the average pilotage per steamer at Hampton Roads being $186.57, instead of $139.38 as shown in other exhibits.

"In this exhibit is shown S. S. Leviathan drawing 36-6 and indicates cost of pilotage on this steamer going to Charleston, Baltimore, Savannah, New Orleans and Galveston, at none of which places is there sufficient water for her. There is also illustrated the cost of pilotage at New Orleans, although many of the steamers shown in this exhibit would be too deep to enter that port. This exhibit, to those not informed, would convey the impression that all of the ports shown have also handled, during the period indicated, the same number of steamers of like draft. Such an impression should be corrected, particularly as to Boston and Baltimore, and the South Atlantic ports.

"Assuming the depths of water shown in Exhibit 'F' are correct, New Orleans is limited to a draft of

twenty-six feet. This would preclude the handling at that port of steamers listed in the Exhibit 'A' showing large revenue on account of deep draft—there being no fewer than 150 steamers, or fifteen per cent, drawing twenty-six feet and over.

"Exhibit 'B' undertakes to show the difference of pilotage charges per steamer at various ports. By using the average of 464 cargo steamers listed in Exhibit 'A,' we find this exhibit corrected as follows:

"Average per ship:

| | |
|---|---|
| Virginia | $186 57 |
| Boston | 194 00 |
| New York | 145 00 |
| Philadelphia | 193 00 |
| Baltimore | 215 00 |
| New Orleans | 237 00 |
| Galveston | 157 00 |

which greatly reduces the average differences as shown in this exhibit."

[10] These and all of the other comparisons which are made, while useful—worthy of careful consideration—are nevertheless confusing and contradictory. They are unconvincing and of little probative value unless many other factors are likewise considered, such as the differences in volume, tonnage of ships, climate, distance, tides, time employed, and other local conditions. It is shown that most, if not all, conditions in Virginia are extremely favorable for the business. The climate is mild, the tides moderate, the distances short, the harbor (Hampton Roads) commodious, and the bottom, instead of being rough and rocky, is sandy or soft, thus lessening the delays and perils of navigation. Among the new facilities which increase the commerce are the army base, established by the

United States government, and the grain elevator and municipal pier established by the city of Norfolk. The Federal government has expended large sums in deepening and widening the channel at the Hampton Roads ports. Much of this channel is now forty feet deep and 475 wide. It is comparatively straight—*i. e.*, the courses are few—it is well defined and marked by buoys, lights and other aids to navigation. It is apparent that the dangers of pilotage in this harbor and the necessary expenses of conducting that business are by favorable natural conditions combined with artificial aids reduced to a minimum. It follows, therefore, that the pilotage rates in such a harbor should not be higher than in other ports lacking such advantages.

It is not strange, then, that patriotic men, witnesses and others deplore the fact that the cargo rates for pilotage on the larger vessels are about twenty to twenty-five per cent higher here than at New York. The appeal for the removal of such a burden upon Virginia commerce is worthy of careful consideration. It should be removed if this can be done without injustice to our pilots. There is a great public interest involved and if the hopes of the Commonwealth are to be verified and we are to realize on our efforts and predictions, if we are to have, develop and maintain the greatest commercial port south of New York, this disparity in rates of pilotage should be reduced and this discrimination should be ultimately removed. Of course, in making this particular comparison, the vast difference in the present volume of business must be considered, and we do not mean that the rights of our local pilots are to be sacrificed to any other commercial interests. What we do mean is, that every burden upon our commerce which can be justly and fairly

removed should be removed. The rates prescribed are an effort to approach this desirable result.

Other comparisons of rates per mile, per hour, tonnage volume, equipment, expenses of operation, all tend to support the conclusion that there should be a reduction in these rates.

[11] As to the expenses of operation and the equipment of the Virginia association compared with such expenses and equipment at other ports: The figures are certainly significant and appear to sustain the charges of extravagance. They indicate that there can and should be a reduction in rates, which under less extravagant administration promise to yield ample returns to each pilot upon his property investment, and fairly pay him for his services.

As illustrative of these extravagant overhead expenses, it appears that for 1923 these expenditures aggregated $208,802.31, and for 1924 $188,225.11. Included therein for each year is $25,000 for depreciation and $25,000, or ten per cent, for interest on the estimated investment of $250,000 in their boats and equipment. (This estimate is held excessive by the Commission.) The gross revenue reported for 1923 was $352,943.08, and for 1924 $376,423.64. These figures may be fairly compared with those of the New York association (127 pilots), where the estimated annual overhead expense is $200,000, exclusive of the pay to active and retired pilots; with Boston (24 pilots), where the cost of operation was $78,000 in 1924; and with Baltimore (51 pilots, 6 apprentices) where the annual operating expense is $75,000.

These expenditures are defended upon the claim that these Virginia pilots are men of exalted type and ideals, that their standards of life are very high, that they are public-spirited and hospitable and make many

contributions as an organization for civic purposes, and through their benevolence aid many good causes and organizations. Many of these activities and generosities are commendable. It is believed that they will be able to maintain their ideals and hoped that they may continue their benevolences. Some of these expenditures, however, tend to justify the suggestion that rates which support such generous activities are too high rather than too low. We shall not undertake to refer in detail to these disbursements, some of which are so much criticised, because it must be conceded that the funds so disbursed were legally collected and belonged solely to these pilots. It was their privilege to expend them for legitimate purposes. If they preferred to maintain an expensive equipment and organization, and also to express their public spirit as well as to exercise their benevolence out of their common funds, and then to divide what remained, it was their undoubted right to do so. So long as they continue this course, however, they have no reason for complaint that the amount left for division yields less to each pilot for his personal use than if the common fund had not been so depleted. It may be a superfluous platitude, but it is certainly pertinent, to add that the more they spend jointly the less they will have separately.

Under the reduced rates prescribed by the Commission, the estimated gross receipts, based on experience, are for 1925 $378,000, and for 1926 $400,237, which if realized and all of the economies suggested by the Commission were effected, the overhead expense of operation would be for 1925 $128,193.33, and for 1926 $128,304.33; and the return to each of the active pilots (50 in number) would be in 1925 $4,996, and to each (53 in number) in 1926 $5,131.

These figures, of course, were mere estimates, but we think that it may be assumed that the receipts are being greatly exceeded, not only because of the general increase of commerce, but especially because the coal business at the three Hampton Roads piers (Norfolk and Western, Virginian and Chesapeake and Ohio) has recently increased enormously because of the coal miners' strike in Great Britain.

The Commission was justified in its conclusion that the existing rates were too high and should be reduced. Whether the rates prescribed are high enough cannot be now confidently determined. Of necessity they must be regarded as experiments. It is certainly clear that such a two-years experiment cannot prove disastrous to the pilots. If they fail to afford fair compensation after just, even liberal, deductions for overhead expenses have been made, they can and should be reconsidered and revised in the light of that experience. If these rates prove to be inadequate, we believe that the antagonistic, uncompromising attitude of the representatives of the association has contributed to the mistake. They gave the Commission little assistance in solving the difficult problem. If they wish the fullest and speediest fruition of their desire for the commercial progress of the Virginia ports, they must cooperate with those who earnestly cherish the same desire. Being engaged in a public service, they must accept public regulation. Public regulation connotes investigation and publicity, but it is believed that it has never been oppressive in Virginia.

Many other significant facts might be specified, but these, we think, are sufficient. The record disclosed no reason which would justify a reversal of the order prescribing these rates.

*Affirmed.*